STATE EX REL. EKERN and others, Petitioners, vs. DAMMANN, Secretary of State, Respondent.

*April 6—May 1, 1934.*

*Walter D. Corrigan, Sr.*, of Milwaukee, *Herman Severson* of Iola, *Joseph Padway* of Milwaukee, *Thomas Amlie* of Elkhorn, *John Thiel* of Mayville, *Edward E. Browne* of Waupaca, *Herman L. Ekern, Fred L. Holmes*, and *Philip F. La Follette*, all of Madison, and *Herbert Steffes* of Milwaukee, for the petitioners.

A separate brief was also filed by *Walter D. Corrigan, Sr.*, of Milwaukee of counsel, for the petitioners.

The *Attorney General, Joseph Hirschberg*, deputy attorney general, *J. E. Messerschmidt*, assistant attorney general, and *William H. Spohn* of Madison, for the respondent.

A separate brief for the respondent was filed by *William H. Spohn* of Madison.

WICKHEM, J.   The first question involved is whether the petition discloses a justiciable controversy. It is the rule, too well established to warrant extended discussion, that this court will not entertain an action for declaratory relief in the absence of a genuine controversy.   *Heller v. Shapiro*, 208

Wis. 310, 242 N. W. 174; *Village of Sun Prairie v. Wisconsin Power & Light Co.* 213 Wis. 277, 251 N. W. 605; *Petition of Breidenbach,* 214 Wis. 54, 252 N. W. 366. The question in this case is whether the action for declaratory relief is not premature. Since the secretary of state has been asked to perform no official duty with respect to giving the new political party a separate ballot, it may be contended that there is at present no controversy in any such sense as the declaratory judgments law contemplates; that the relief asked is simply an advisory opinion based upon the hypothesis that the party is formed, seeks to qualify at the general election of 1934, and is refused such right by the defendant. The matter is not free from difficulty, but we have concluded that it sufficiently appears from the petition that there is a determination upon the part of the group seeking declaratory relief to form a new political party, and that in response to a request for an official ruling, this defendant has indicated that he will make such rulings as will render the organization ineffective, at least in so far as opportunity to support its candidates at the 1934 fall election is concerned. In view of the decision to form such a party and the ruling of the defendant, it must be held that a controversy exists. This is especially true in view of the subject-matter of this action. It deals with the electoral franchise and with the rights of citizens to express their political opinions through the medium of a political party. It goes without saying that the term "controversy," as applied to the rights of the great mass of citizens, must receive a somewhat more liberal definition than when applied to the ordinary relations of individuals with each other. The right of a large body of citizens holding similar political views to so organize as to make these views effective is an important one. Where there exists a genuine determination so to organize, and a threatened obstacle to the accomplishment of this purpose in the form of

an official ruling, a controversy exists. To hold otherwise would require the group to go to the expense and labor incident to organization, with no assurance that any of these steps would be presently effective. We conclude, therefore, that the petition discloses a justiciable controversy, and that it may be proper to entertain the action so far as the declaratory judgments law is concerned. So far as the right to commence an original action or the propriety of this court taking jurisdiction are concerned, no questions are raised, nor could it be contended that this is not a proper case for the exercise of original jurisdiction, assuming the petition to state a cause of action for declaratory relief.

For convenience, the rulings of the secretary of state, which form the basis of his contentions in this action, will be set forth *seriatim* and disposed of.

The first ruling of the defendant is as follows:

"That even though a new political party complied with the statutory requirements for and obtained a new party column for the primary of 1934, the names of candidates receiving the largest number of votes for each respective office would not be placed in the new party's column on the general election ballot, but instead would be placed in the independent column, for the reason that under sec. 5.17 (1) such new party having had no candidate for governor at the last two preceding elections, there would be no basis for figuring the percentage requirement in said section provided."

At this point it is necessary to consider not only the statutes involved, but the well-established rulings of this court with reference to the electoral franchise. In *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041, it is stated that "constitutional inhibitions of legislative interference with a right, including the right to vote and rights incidental thereto, leaves, yet, a field of legislative activity in respect thereto circumscribed by the police power. That activity appertains to conservation, prevention of abuse, and

promotion of efficiency." It is also said—and this by the unanimous court—that "the right of suffrage includes the right of voters to separate into groups according to their political beliefs respecting governmental policies, and the right of every group to organize and have all the machinery in that regard not reasonably prohibited by law for making the organization effective as regards declaring the policy of its members, and vitalizing such policies by electing officers in harmony therewith to legislate and execute law to that end." The court goes on to say that "every legislative interference with freedom on the part of voters to form political organizations and to act under their chosen party names to accomplish the purposes of the organizations is at the same time an interference with the right to vote, so the limit of power as to the one is substantially the limit of power as to the other," and must be justified under the police power, which in substance means that such regulation as is adopted must pass the tests usually applied in ascertaining the validity of any exercise of this power. If the right to vote or the right to organize into political groups had been held to be a matter of grace, as in *Healey v. Wipf,* 22 S. D. 343, 117 N. W. 521, where the court said: "The election franchise is not a natural right. It is a privilege which may be taken away by the power that conferred it," it might be concluded that where the legislature has not furnished the machinery by which the voters may express their views at the polls through political parties, no such power exists. However, since the right of the voters so to express themselves is a constitutional right that may be regulated but not destroyed by the legislature, a failure on the part of the legislature to restrict results not in the absence of power on the part of the voters to express themselves in this manner, but in an absence of restriction upon the power. In the light of this principle, and with full recognition of the fact that the function of the court is to construe and not to legislate, the statutes involved may now receive some consideration.

In sec. 5.05, Stats., dealing with primary nomination papers, except for city primaries, two sections deal with new political organizations and present to members of such organizations a choice of methods of organizing so as to entitle them to a separate ballot. Sec. 5.05 (6) (d) provides:

"(d) . . . But any political organization which at the last preceding general election was represented on the official ballot by either regular party candidates or by individual nominees only, may, upon complying with the provisions of this act, have a separate primary election ticket as a political party, if any of its candidates or individual nominees received one per cent of the total vote cast at the last preceding general election in the state, or subdivision thereof, in which the candidate seeks the nomination, under such designation as the chairman and secretary of such organization shall certify to the secretary of state as the name of such party, which shall not duplicate the name of any other party."

It will be noted that by the terms of this section a new political group may, for its first year, be represented on the official ballot by individual nominees only. At the next election the group may have a separate primary election ticket as a political party if any of its nominees at the first election received the vote required by the section.

Sec. 5.05 (6) (e) provides so far as material to this point:

"(e) Any other political organization which shall file with the secretary of state, not less than ninety days prior to the holding of a September primary, a petition signed by not less than one-sixth of the electors in at least ten counties therein, or by one-sixth of the electors within any senatorial, assembly or congressional district, praying that said organization be given a party ticket at the said September primary, may have a separate party ticket as a political party in such district or in the state, as the case may be, at such primary; . . ."

Whatever other controversies there may be as to the meaning of these sections and their practical working, it is not disputed that they evidence a legislative intent to authorize new

political groups to have a separate party ballot in the primaries.

The basis of defendant's first contention, as evidenced by his ruling, is sec. 5.17, which provides as follows:

"(1) If all candidates for nomination for any one office voted for on any party ballot shall receive in the aggregate five per cent or more of the average of the vote cast for the nominee of such party for governor at the two last general elections, the person receiving the greatest number of votes . : . shall be the candidate of that party. . . ."

Defendant contends that this section is applicable to all parties having a separate primary ballot; that it was the legislative intent not merely to compel existing political organizations to maintain their strength after achieving a place upon the general ballot, but to demonstrate their strength before receiving such a place. Plaintiffs contend that the section applies only to political organizations that have been in existence long enough to have had candidates at two previous elections for governor. The section contains internal evidence that the legislative intent was not that claimed by the defendant. It can never be applied to a new party. Until a party succeeds in getting a party column on the general election ballot, it does not have a nominee for governor in the statutory sense, and it never could qualify under sec. 5.17. In other words, such a party can never pass the test prescribed by sec. 5.17 for securing a place on the general ballot until it has had such a place upon the ballot for two successive elections for governor. The mere statement of this indicates the impossibility of ascribing such an intent to the legislature. The conclusion is that sec. 5.17 has no application to new political groups. For the defendant there is some reliance upon the following statement in the *McGrael Case:*

"Thus no party can in a special column, be represented by a candidate for an office at one election, unless, first, it shall

have had a party candidate for governor at the preceding general election; . . ."

It is frankly admitted by defendant that this statement was not addressed to the question before the court or necessary for the decision, and these concessions are not improvidently made. The statement constitutes a *dictum* by which this court is not bound, and minimizes the further contention that the statement called the attention of the legislature to the statute, and that the legislature, by failing to so amend as to make the statute clear, adopted the interpretation of the court. Defendant concludes that the legislature apparently gave no serious thought to statutes affecting new parties, and did not have them in mind when .it enacted the statute which, properly construed, impedes their organization and makes difficult an effective expression of their views. The legislature having failed to deal with the subject, it is argued at some length that this court, without usurping the function of the legislature, cannot so fill the gaps existent in the present law as to enable a new party to have a place on the general ballot following its first appearance in the primary.

In dealing with this contention it again becomes necessary to consider the rule as stated in the *McGrael Case*. Measures taken by the legislature to regulate the manner of voting are restrictions upon the constitutional right of voters, not merely to vote but to make effective their views through political organizations. The legislature is not the source of the right; it is merely the source of the restriction, if it imposes one. Thus the court, in construing sec. 5.17 and similar statutes, is not in search of legislative authorization for the new party, or legislative machinery to give such an organization effectiveness. The objective is to find intended restrictions or regulations of the rights of the citizens comprising the new group, and the new party is entitled to a place upon the general ballot if none is found. Thus it is

our conclusion that the statute having provided a means by which a new party group may have a separate primary ballot, and having attached no conditions, restrictions, or obstructions in the way of placing the nominees of such a group upon the general ballot, none were intended. We think this conclusion conforms not only to the doctrine of the *McGrael Case,* but to sub. (6) of sec. 5.01, which provides:

"(6) This title shall be construed so as to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to comply with some of its provisions."

It was held that the rule of liberal construction enunciated by this section applies to ch. 5. *State ex rel. Oaks v. Brown,* 211 Wis. 571, 249 N. W. 50.

The second contention of defendant is that should a petition containing the names of one-sixth of the electors in ten counties in the state be presented to the secretary of state, the secretary of state, under the provisions of sec. 5.05 (6) (e), could grant the new party column for only the five state offices but not for the office of United States senator, nor any of the county offices, and that in order to obtain a party column to include each congressional, assembly, and senatorial office to be sought for, it would be necessary to file a separate petition containing one-sixth of the electors in each such district, and that however many petitions were filed, no new party ticket could include under any circumstances the office of United States senator or any of the eight county offices. It must be conceded at the outset that sec. 5.05 (6) (e) offers considerable support for the views of the defendant. The section is very inartificially drafted, and its construction is not free from difficulty. It is our conclusion that the words, "may have a separate party ticket as a political party in such district or in the state, as the case may be, at such primary," have reference to territory and not to offices; that a party, the petition of which qualifies it for a party ticket in the state, is entitled to a full party ticket and not merely

to a ticket containing the names of nominees for state offices. Whatever doubt there may be as to the validity of this construction is created by the following sentence:

"And all candidates of such party for the nomination as candidates for the office of member of the assembly or of the senate or for representative in congress, if the petition be signed by electors in the district only, or for the nomination as candidates for state offices, if the petition be signed by the above required number of electors in at least ten counties in the state, shall, upon complying with the provisions of law relative to nomination papers, be placed upon such ticket."

It is contended that this clause indicates the scope of the party ticket; that if a petition is filed within an assembly district only, the party ticket will contain only the candidate for assembly; that if the petition is signed by the requisite number of electors in at least ten counties of the state, the new organization will be entitled to a separate party ticket for state offices only. In so far as it may be said to be in conflict with the preceding one, this clause must yield, for it deals not with the scope of the party ticket but with the steps necessary for candidates to put themselves upon the party ballot at the primaries. It is our conclusion that the term "separate party ticket . . . in the state" means a full party ticket throughout the state, including all offices, without restriction. The term is sufficiently inclusive to cover county offices and the office of United States senator, and the term is one that in common usage denotes a full party ticket throughout the state, including all offices to be voted for at the election.

With respect to the office of United States senator, attention is called to sec. 5.02 (3), which reads as follows:

"Party candidates for the office of United States senator shall be nominated in the manner provided herein for the nomination of candidates for state offices."

If the party candidates for this office are in all respects to be governed as to their nomination by the rules governing

candidates for state offices, and if the reference to a party ticket in the state is geographical and not limited to particular offices, there can be no question of the right of a political organization qualifying for a state ticket under sec. 5.05 (6) (e) to have included upon such ticket the office of United States senator.

The next contention of defendant is that the word "electors" as used in sec. 5.05 (6) (e) means the total number of all eligible voters and not just those who have voted at any given election. Throughout sub. (6) (e), in describing the requisites of the petition, the term "one-sixth of the electors" is consistently used. Standing alone, the conclusion might be nearly inevitable that one-sixth of the electors within any senatorial, assembly, or congressional district, or in at least ten counties in the state, means the total number of electors qualified to vote. The phrase might be considered to have such a plain and unambiguous meaning as not to warrant the application of rules of construction. However, the statute, in our opinion, contains indisputable evidence that such is not the meaning of the phrase. The last sentence of the subsection provides:

"The basis for ascertaining the number of signers required on any such petition shall be the same as for ascertaining the number of signers necessary on nomination papers as provided in this section."

The words, *"the basis* for ascertaining the number of signers," can only apply to the number, one-sixth of which will qualify the new party for a separate party ticket in the primary. It is indicated that the basis has previously been stated in the section, and upon an examination of sub. (6) (d) we find that *the basis* of percentage, that is to say, the total number of which a percentage is taken, shall be the vote of the party for the presidential elector receiving the largest vote at the last preceding presidential election in which such party had candidates for presidential electors. Obviously,

the new party has had no previous candidates for presidential electors and no previous party vote. But *the basis* of percentage disclosed by sub. (6) (d) is the vote for presidential electors. In the case of existing parties the percentage is to be applied to the vote for the presidential elector of that party receiving the highest number of votes, but the basis to which the percentage is to be applied in all cases where total numbers and not previous party votes are involved, is the total vote for presidential electors at the last preceding presidential election. Thus the total vote for presidential electors gives the total number, one-sixth of whom must sign the petition for the new party.

The next contention of defendant is that even though a new party column were to be granted, the names of no individuals could be placed thereon at the 1934 primary, since under sec. 5.05 (6) (d), such party had no candidates for presidential electors at the last preceding presidential election, and hence there would be no basis for determining the number of signers necessary for nomination papers for individual candidacies. It is literally true that sec. 5.05 (6) (a), (b), and (c) can have no application to a new party, for the reason that such a party has not had previously a party vote and the number of signers upon nomination papers cannot be determined. It is also clear from sec. 5.05 (6) (e) that the candidates of the new party must qualify for places upon the primary ballot by filing nomination papers, it being specifically provided that such candidates, upon complying with the provisions of law relative to nomination papers, shall be placed upon such ticket. We have thus presented this situation: The provisions of sec. 5.05 (1) to (5), inclusive, could all be applied to the candidates for a new political party. Subs. (1) and (2) provide the form of the nomination papers; sub. (3) provides that each signer of a nomination paper shall sign but one such paper for the same office, declare that he intends to support the candidate named thereon,

add his residence, with the street and number, if any, and the date of signing; sub. (4) relates to the time within which the paper may not be circulated; sub. (5) relates to the residence of signers, and to the verification by qualified electors as to the qualifications of signers. All of these provisions may quite easily be applied to candidates of a new party as well as to candidates of other parties. Does the fact that there is no basis ·for applying sub. (6), dealing with the number of signers and based upon a percentage of a previous party vote, result in the conclusion that there is no machinery for placing the names of candidates for nomination upon the ballot? We think not. It cannot have been the intention of the legislature to apply to such candidates impossible and inapplicable restrictions. It was intended that they file nomination papers. It was intended that they comply with the provisions of law relative to nomination papers, in so far as those provisions are applicable to candidates of a new party. All of the provisions except those regulating the number of signers are clearly applicable and apply. The provisions in sec. 5.05 (6) (a), (b), and (c), dealing with the required number of signers, cannot and do not apply. Why the legislature chose to leave this situation unprovided for is not clear. It might have been inadvertence; it might have been the consideration that the contest for nomination in new parties is not ordinarily keen nor is the number of candidates large. However that may be, we think the result of the section is that there is no requirement with respect to nomination papers as to the number of signers, and that a nomination paper, otherwise correct in form and satisfying the applicable provisions of sec. 5.05, must be received and the name of the candidate placed upon the primary ballot.

*By the Court.*—It is declared and adjudged:

(1) That sec. 5.17 has no application to a new political party, and that such a party, upon compliance with the provisions of sec. 5.05 (6) (e), is entitled to a place upon the general ballot.

(2) That upon filing a petition containing the names of one-sixth of the electors in ten counties in the state, praying for a party column, such a party is entitled to a full party ticket throughout the state, including county offices and that of United States senator.

(3) That the term "electors" as a basis upon which the number of petitioners required by sec. 5.05 (6) (e) is to be computed means the total number of voters who voted in the last presidential election.

(4) That candidates for a place upon the primary ballot of a new party which has complied with the provisions of sec. 5.05 (6) (e), must qualify for such place by filing nomination papers in full conformance with sec. 5.05 (1) to (5), inclusive, but that sec. 5.05 (6) (a), (b), and (c), have no application to the papers of such candidates, and that with respect to them, the statute makes no requirement as to the number of signers necessary to qualify such candidates for a place upon the primary ballot.