CHRISTIAN ACTION PARTY OF PUERTO RICO, ETC., Petitioners and Appellants, *v.* ROBERTO VERAY TORREGROSA ET AL., Defendants and Appellees.

No. AP-63-33.     Decided February 19, 1964.

*Francisco Hernández Vargas* for appellants. *J. B. Fernández Badillo, Solicitor General,* for appellees.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

The political group known as "Christian Action Party" is in process of registration to participate as a party by petition in the 1964 general elections. In view of the existing

conflict of criteria between the directors of that group and the public officers as to which is the applicable law and governing the registration of new political parties, the former filed in the Superior Court a petition for a declaratory judgment against above-entitled appellees. Their complaint was dismissed and they allege before this Court that the trial court committed the following errors:

## "(A) *FIRST ERROR*

"The Superior Court erred in holding that in order to acquire the category of party by petition for the 1964 elections, the Christian Action Party must register candidates by petition in and for three-fourths or more of the electoral precincts of the Commonwealth and to file petitions for nomination of candidates equivalent to ten percent or more of the total votes cast for all the candidates for the office of Governor in the 1960 elections.

## "(B) *SECOND ERROR*

"The Superior Court erred in holding that Act No. 140 of June 30, 1961 does not increase the minimum requirements for the registration of new parties by the Act in force when the Constitution took effect; that Act No. 140 of 1961 is in full force and effect; that Veray Torregrosa acted within the law in refusing to administer oaths to the petitioners; and that the General Supervisor of Elections is the custodian of the petitions for registration of candidates.

## "(C) *THIRD ERROR*

"The Superior Court erred in holding that plaintiffs have no standing to obtain the remedy of declaratory judgment because they have not registered as yet in one-half of the electoral precincts of the Island, nor filed petitions in a number equivalent to five percent of all the votes cast for Governor, assuming that such requirements are the necessary ones."

CAP maintains that by virtue of § 6 of art. IX of the Transitory Provisions of our Constitution, the law which governs and establishes at present the minimum require-

ments for the registration of new parties is Act No. 6 of September 27, 1951 (Sp. Sess. Laws, p. 106), which amended § 14 of the Election Law, rather than Act No. 140 of June 30, 1961 (Sess. Laws, p. 304), which amended § 37 of the Election Law.

In our judgment, appellants stand on an erroneous premise and accordingly reach an erroneous conclusion. The constitutional provision invoked by petitioners-appellants reads as follows:

"Section 6.—Political parties shall continue to enjoy all rights recognized by the election law, provided that on the effective date of this Constitution they fulfill the minimum requirements for the registration of new parties contained in said law. Five years after this Constitution shall have taken effect the Legislative Assembly may change these requirements, but any law increasing them shall not go into effect until after the general election next following its enactment." (Section 6 of the Transitory Provisions of the Constitution.)

The clear purpose of these provisions is to guarantee the subsistence of the political parties with all the rights recognized to them by the Election Law. In order to continue that subsistence it was sufficient for the political parties to fulfill the minimum requirements for the registration of new parties provided by the law in force when the Constitution went into effect. These requirements were less than those required by the Election Law in order to retain the category of principal party after the elections were held. The Legislative Assembly could not change those requirements during the first five years after the Constitution went into effect, and any law enacted after five years increasing those requirements would not have effect until after the general elections next following its enactment. Thus, the political parties which participated in the 1948 general elections as principal parties or parties by petition subsisted as principal parties if they fulfilled the minimum requirements for the registration of

new parties provided by the law in force on July 25, 1952. The parties which participated in the 1952 and 1956 elections enjoyed the same protection. For the purposes of the subsistence or retention of the status as political party, the Legislature could change the minimum requirements provided by the Election Law five years after the Constitution took effect, although the law increasing those requirements would not go into effect until after the general elections next following its enactment.

What we wish to stress is that the purpose of that constitutional provision is to protect the subsistence of the political parties rather than the registration of new parties, which is, in our opinion, the error committed by appellants. How does a party lose its category of principal party or of party by petition? When the candidate of that party for Governor of Puerto Rico fails to obtain in the preceding general elections a number of votes equivalent to ten percent of the total votes cast at the last immediately preceding general elections by all the parties for all the candidates for Governor of Puerto Rico. It is so provided by § 14 of the Election Law. However, the Constitution changed the requirements for the subsistence of political parties as such at least during a period which some delegates to the Constituent Assembly called a "freezing" period, by providing that "they shall continue to enjoy all rights recognized by the Election Law, provided that on the effective date of this Constitution they fulfill the minimum requirements for the registration of new parties contained in said law."

And the act which established the minimum requirements for the registration of new parties at the time the Constitution took effect was § 14 of the Election Law, as amended by Act No. 6 of September 27, 1951. That section provides:

"Section 14.—Political parties shall be the principal parties and the parties by petition. Principal party shall be any political party whose candidate for Governor of Puerto Rico received at

the last immediately preceding general election a number of votes equivalent to ten (10) per cent or more of the total vote cast in said last immediately preceding general election by all parties for all candidates to the office of Governor of Puerto Rico.

"Principal majority party shall be the principal party whose candidate for Governor of Puerto Rico received at the last immediately preceding general election the largest number of votes cast in said last immediately preceding general election for all candidates to the office of Governor of Puerto Rico.

"Party by petition shall be any political party which, in accordance with Section 37 of this Act, registers in the Office of the Executive Secretary of Puerto Rico, for the immediately following general election, candidates by petition in and for three-fourths or more of the electoral precincts throughout the Island, and which files in said office, for said election, petitions for the nomination of candidates signed by a number of petitioners equivalent to ten (10) per cent or more of the total vote cast for all candidates to the office of Governor of Puerto Rico in the last immediately preceding general election.

"To the effects and for the purposes of the election to be held in November of the year 1952, any party shall be considered a party by petition and shall have the same rights as any principal party, which for said election, in accordance with Section 37 hereof, registers, in the office of the Executive Secretary of Puerto Rico, candidates by petition in and for one-half or more of the election precincts throughout the Island; and which files in said office, for said election, petitions for the nomination of candidates, signed by a number of petitioners equivalent to five (5) per cent or more of the total number of votes cast in the general election of 1948 for all candidates to the office of Governor of Puerto Rico. Said five (5) per cent shall be computed by taking into consideration only the petitions for the nomination of candidates filed by said party in accordance with section 37 of this Act, in those municipalities in and for which said party has filed in the office of the Executive Secretary petitions for the nomination of candidates signed by a number of petitioners equivalent to ten (10) per cent or more of the votes cast in each one of said municipalities for all can-

didates to the office of Governor of Puerto Rico in the 1948 election.

"Any political party which retains, acquires, or has the category of principal party, or of principal majority party, or of party by petition, shall be considered as, and enjoy the rights of, such principal party, principal majority party, or party by petition, until the candidate of said party to the office of Governor of Puerto Rico fails to obtain in a general election the number of votes necessary for attaining the category of principal party or principal majority party, or party by petition, in accordance with the provisions of this section.

"Except as otherwise provided in this section and in section 47 of this Act, every member of the Insular Board of Elections and every member of a local election board shall be entitled to and vote in said boards."

The minimum requirement provided by this section in order that a party may qualify as a party by petition is the registration in the Office of the Executive Secretary of Puerto Rico, for the immediately following general elections, candidates by petition in and for three-fourths or more of the electoral precincts throughout the Island, and the filing in that office for such elections of petitions for nomination of candidates signed by a number of petitioners equivalent to ten percent or more of the total votes cast for all candidates for the office of Governor of Puerto Rico in the last immediately preceding general elections. This is the requirement which we shall call, in abbreviated form, ten percent and three-fourths of the electoral precincts.

■ As a transitory provision, § 14 *supra* reduced those requirements to the effects and for the purposes of the elections to be held in November 1952. In order to be considered a party by petition, it was sufficient to register for the elections of the year 1952 candidates by petition in and for one-half or more of the electoral precincts throughout the Island, and petitions for nomination of candidates signed by a number of petitioners equivalent to five percent or more of the total votes cast in the 1948 general elections for all candi-

dates for the office of Governor of Puerto Rico. We shall call it the requirement of five percent and one-half of the electoral precincts. We repeat that the transitory provisions reducing the percentage of votes and the number of precincts applied only to the elections to be held in November 1952. It does not extend, according to the context of § 14 *supra* of the Election Law, to the elections next following that of 1952. There is no question, however, that this minimum requirement of five percent and one-half of the electoral precincts governed for the registration of new parties as a transitory provision of § 14 of the Election Law on July 25, 1952, the effective date of the Constitution. Therefore, the political parties which in the 1948 elections received five percent of the total votes cast for all candidates for the office of Governor in one-half or more of all the electoral precincts were protected in their category of principal political parties by virtue of the constitutional provision copied at the outset of this opinion.

■ This was the requirement which was "frozen" in order to guarantee the subsistence of the political parties. However, that has nothing to do with the minimum requirements provided by § 14 for the registration of new parties. On this point the act in force on July 25, 1952 was clear. It required ten percent in three-fourths of the electoral precincts, with the exception of those parties which were registered by petition for the elections held in November 1952. After those elections the requirement of ten percent and three-fourths of the precincts again governed. It was so provided by the Election Law when the Constitution went into effect. Should it be considered that the Constitution "froze" the requirement of five percent for the registration of new parties, it would be necessary to add something to § 14 *supra*, in the fourth paragraph thereof, so as to read more or less like this: "To the effects and for the purposes of the election to be held in November of the year 1952, *and those which*

*may be held thereafter,* any party shall be considered a party by petition, etc." Act No. 6 of September 27, 1951 provided, on the contrary, for the expiration of its effectiveness, since according to its own terms it applied only to the 1952 elections. The laws which were not inconsistent with the Constitution continued in full force until amended or repealed or until they expired by their own terms. Art. IX, § 1, of the Constitution.

Our theory finds support both on the report of the Committee which considered the said constitutional provision and on the debates of the Constituent Convention.

The report of the Committee states the desire of the Convention thus: ". . . Nor does it involve the expression of a policy aimed at permitting the proliferation of political parties, *but we wish the subsistence of those which, having qualified to continue enjoying* the political rights inherent in organized political parties, cast for the office of Governor, under their emblem, a number of votes equivalent to five percent of the votes cast by all the parties for that office. At present this is the minimum requirement in order that the newly organized parties may register and operate as such. The rule which we adopt is not unbending; after five years the Legislative Assembly may change those requirements reducing or increasing them; if they are increased, the law so doing may not take effect until after the next following elections. We are not creating a privilege. All existing parties, and even those which may be organized as long as the rule herein adopted is not changed, shall enjoy the same rights." Report of the Committee on Transitory Provisions and General Matters, 4 Journal of Proceedings 2627 (Equity ed. 1961). (Italics ours.)

The Constituent Convention was dealing with the subsistence of those parties which had participated in the preceding general elections. The purpose was to guarantee the subsistence of those parties by requiring only that they shall

have cast or might cast for the office of Governor, in one-half of the electoral precincts, a number of votes equivalent to five percent of the votes cast by all the parties for such office in the 1948 elections. The constitutional provision does not mention this five percent, but it says so in another way in providing that the political parties shall continue enjoying all the rights recognized to them by the Election Law, "provided that on the effective date of this Constitution they fulfill the minimum requirements for the registration of new parties *contained in said law.*" That is why the report of the Committee makes reference to the minimum requirement of five percent for the registration of new parties provided by the Act at the time the report was rendered and the Constitution took effect. The reality was that the requirement of five percent and one-half of the electoral precincts for the registration of new parties governed for the 1952 elections but not for succeeding elections, by virtue of the amendment to § 14 of the Election Law made by Act No. 6 of September 27, 1951. The purpose of the "rule herein adopted" to which reference is made in the report is to guarantee the subsistence of the existing parties and of those which may be organized, provided they cast in the general elections a number of votes equivalent to five percent of all the votes cast for the office of Governor. Political parties, principal as well as by petition, exist before the general elections, but they only *subsist* after the elections provided they have deposited in the ballot boxes the number of votes required by law. That number of votes was reduced from ten to five percent by virtue of the constitutional provision.

In the course of the debate of the transitory provision in the Constituent Assembly respecting the rights of political parties, many delegates were concerned with two fundamental questions on which a great part of the debate turned. The first was whether greater requirements should be requested of the existing political parties to subsist as such

parties than the new parties to register. The situation at that time was that according to the Election Law in force the parties which subsisted as principal political parties were those whose candidate for Governor received in the last general elections immediately preceding a total number of votes equal to ten percent or more of the total votes cast at those elections by all the parties for all the candidates for Governor, while by the Act of 1951, which amended § 14 of the Election Law, the new parties were only required to register petitions in one-half of the electoral precincts equivalent to five percent of the total number of votes cast for the office of Governor in the 1948 elections. Had it not been for that amendment which would govern for the 1952 elections, the percentage of votes for the registration of new parties was ten, or the same percentage required by law for the subsistence of political parties.

It was considered unfair to require five percent for the registration of new parties for 1952, while a greater number of votes was required for the subsistence of the old parties.

The second question which was also debated was the guarantee of the same rights to the parties which may be organized.

We understand that there was no debate on the requirements for the registration of new parties, nor that the purpose of § 6 of the Constitution establishes such requirements. Delegate Solá Morales said:

"This provision does not prohibit at all that such other methods may appear, be adopted and operate. We propose, naturally, a period which we could call a freezing period, not of political parties, but of exigency, of requiring the political parties as to the amount of votes to be required for their subsistence as principal party. That is what we freeze for a number of years, and colleague Negrón López now believes that the five percent is good. Tomorrow three or two may be good and this provision does not prohibit it, but it does prohibit that more than five percent be required for a specified period; and [it requires]

that our people be permitted to have their ways of expression with this facility of five percent in order that the striving parties may retain their juridical personality on a par with the new parties which may register. This is, Mr. Chairman, the true purpose of our amendment. There is no reason why we should embitter our life and complicate it with technicalities. It is a clear and simple thing. 'You, people, may register a political party with five percent of the voters who may give you their petitions. You, people, you may retain your political party if you cast five percent of the votes in the elections.' That is all; since the law previously said that both things could be obtained on the basis of ten percent, today we limit it to five percent.

"I hope, Mr. Chairman and colleagues, that in this period— in this period of freezing of that condition of requiring the political parties a specified number of voters in order to subsist as such—I hope that our democratic growth, that the development of the methods of the people of finding better ways of expression shall have produced greater things and that this then will not be necessary. In the meantime I believe that there exists at present an inexplicable situation of inequality, of imbalance, because political parties are required five percent for registration purposes while another political party is required ten percent to retain its personality. I believe they should be on a par, the way it used to be in the law." (3 Journal of Proceedings of the Constituent Convention 2179, 1961 ed.)

The same delegate had already stated the following:

"And in saying that we should be consistent with ourselves, what I point out is the fact that the existing Election Law in Puerto Rico required ten percent of the votes for political parties both to subsist as such after an election and to register and have the right to be recognized as a political party. Certain amendments have thereafter been introduced. It seems to me that the law has been amended on two occasions and the requirement for the registration of political parties has been limited. At this very moment there is in force in Puerto Rico a law which limits to five percent the number of petitions needed by a party to comply with the legal requirements and to be an organized party, and while we have done that for the parties which may register, we maintain in the law ten percent for the parties which are registered and operating in the democratic

struggle of the Puerto Rican people." (III Journal of Proceedings of the Constituent Convention 2178, 1961 ed.)

When delegate Negrón López mentioned the five percent in certain areas and ten percent in others, he was referring, as he himself said, to "what the Election Law provides at present." Yet, his argument does not shed much light on the problem under consideration and that is due to the fact that the theory advocated at that time by the delegate was that the problem involved in § 6 of the Constitution "is not of a constitutional character, it could be left to the Legislative Assembly." In other words, the delegate objected to the incorporation in the Constitution of a transitory provision on the rights of political parties in the belief that the question was for the Legislative Assembly.

■■ Summing up, the requirement of five percent and one-half of the electoral precincts was frozen by § 6 of the Transitory Provisions of the Constitution for the *subsistence* of the political parties and not for the registration of new parties. And this is so because the requirement of five percent was at the same time a provision limited and applicable only to the new parties which might register for the 1952 elections. That was how § 14 of the Election Law stood on June 25, 1952, five percent and one-half of the precincts for the registration of new parties for the 1952 elections and ten percent and three-fourths of the precincts for succeeding elections. After the general elections of 1952, the Legislature did not enact any law restoring the requirement of five percent as it did by Act No. 6 of September 27, 1951 for the 1952 elections. On the contrary, Act No. 140 of June 30, 1961 ratified the requirement of ten percent for the registration of new parties. And since the Constitution froze the requirements for the *subsistence* of the political parties but not the requirements for the registration of new parties, it is obvious that CAP may only acquire the category of party by petition if it

meets the requirement of ten percent and three-fourths of the electoral precincts.

For the reasons stated, the judgment appealed from will be affirmed.

The Chief Justice delivered a dissenting opinion in which Mr. Justice Hernández Matos and Mr. Justice Santana Becerra concur.

Mr. Justice Santana Becerra delivered a dissenting opinion in which the Chief Justice, Mr. Justice Hernández Matos and Mr. Justice Blanco Lugo concur.

Mr. Justice Blanco Lugo delivered a dissenting opinion in which Mr. Justice Santana Becerra concurs.

—O—

Mr. Chief Justice Negrón Fernández, with whom Mr. Justice Hernández Matos and Mr. Justice Santana Becerra concur, dissenting.

San Juan, Puerto Rico, February 19, 1964

I

If § 6 of art. IX of the Transitory Provisions of our Constitution has the scope attributed by the majority opinion in asserting that the purpose of that provision "is to guarantee the subsistence of political parties rather than the registration of new parties," then the Constituent Convention did not accomplish its purpose since, far from reducing the requirements to "guarantee the subsistence" of political parties, it made them more burdensome. So much so that three political parties which emerged from the 1948 elections as *principal parties*, according to the legislation then in force (having cast for their candidate for Governor in those elections ten percent or more of the total votes cast by all the parties for all the candidates for Governor), would have disappeared from the political picture by constitutional fiat if the new requirements "reduced" by § 6 *supra* were applied

to them. I turn to illustrate this eloquent contradiction of generous grace attributed to the Constituent.

The following five political parties participated in the elections held November 2, 1948: Popular Democratic, Statehood, Socialist, Reform, Independence.

According to the official statistics of those elections published by the General Supervisor of Elections of Puerto Rico, the total votes cast by all the parties for the office of Governor was 640,714. That total was allocated among the aforementioned parties as follows:

Popular Democratic Party, 392,386; Statehood Party, 89,441; Socialist Party, 64,396; Reform Party, 29,140; Independence Party, 65,351.

As may be observed, with the exception of the Reform Party, each of the other parties obtained ten percent of the total vote cast for Governor in those elections. According to § 14 of the Election Law then in force, the Statehood, Socialist and Independence Parties, each having cast more than ten percent of the total vote for the office of Governor, retained or acquired in those elections the status of *principal party,* and the Popular Democratic Party that of *principal majority party.*

According to the requirements for the registration of new parties prescribed by § 14 of the Election Law, as amended by Act No. 6 of September 27, 1951 to the effect and for the purposes of the elections to be held in November 1952, it was necessary to register in the then Office of the Executive Secretary, for those elections, candidates by petition *in and for one-half or more* of the electoral precincts throughout the Island, and to file in that office petitions equivalent to five percent or more of the total votes cast in the 1948 general elections for all candidates for the office of Governor. The said five percent, however, should be computed taking into account only the petitions in those municipalities in and for which the party would have filed petitions for the nomination

of candidates, signed by a number of petitioners, equivalent to ten percent or more of the votes cast in each of those municipalities for all the candidates for the office of Governor in the 1948 elections.

The latter are the requirements which the majority opinion considers "less than those required by the Election Law to retain the category of principal party after the elections are held." And they are the requirements the purpose of which, according to that opinion, upon being "frozen" by § 6 of art. IX of the Transitory Provisions, "guarantee the subsistence of political parties" with all the rights guaranteed to them by the Election Law. Hence, the assertion that "the political parties which participated in the 1948 elections as principal parties or by petition subsisted as principal parties if they met the minimum requirements for the registration of the new parties provided by the act in force on July 25, 1952."

Nothing more contradictory of the result of the 1948 elections.

None of the parties which in those elections received more than ten percent of the total votes cast for Governor by all the parties in the 1948 elections—and that, therefore, acquired or retained under § 14 of the Election Law then in force the category of principal party (with the exception of the principal majority party)—would have subsisted as such party if it had been required to comply with the minimum requirements for the registration of new parties by the act in force on July 25, 1952. According to these requirements, when applied to a party for the purpose of determining its post-electoral status, such party should have cast, in each *of one-half or more* of the electoral precincts throughout the Island, ten percent or more of the total votes cast by all the parties for their candidates for Governor in the 1948 elections in each of such precincts, the sum of which votes so cast should be five percent or more of the total votes cast by

all the parties for their candidates for Governor in those elections. *Cf. C.A.P.* v. *Muñoz Marín, Governor,* 87 P.R.R. 166 (1963). Thus, the Statehood Party received ten percent of the votes in only 39 of the 80 precincts into which the Island was divided in 1948; the Independence Party in only 30; and the Socialist Party in only 26. By applying the "less" requirements which, it is said, were incorporated in § 6 of Art. IX of our Constitution for the only purpose "to guarantee the subsistence" of the political parties, the three minority parties which had already acquired or retained the category of principal parties under the requirement of the Election Law which prescribed that in order to subsist they needed ten percent of the total votes cast for Governor in the 1948 elections, would have disappeared from the political picture by the very action of the Constituent Convention.

Summing up: the basis on which the majority opinion rests falls by the wayside. It cannot be conceived that the Constituent Convention should impose requirements which, judging by the electoral experience of 1948, were more burdensome for the subsistence of the political parties than those required therefor by the Election Law then in force.

## II

Assuming that the Constituent Convention had wished to impose on political parties, *in order that they could subsist,* the same requirements provided by the law in force for the registration of new parties, even though they were more burdensome, as a problem of statutory construction as well as because of its unequal treatment to the citizens interested in nominating candidates by petition, the majority opinion is, in my judgment, also erroneous. I shall not stop at this time to examine the question as a problem of statutory construction.

The right to organize a political party is inherent in the voters and it includes the right of suffrage. *Cooper* v. *Cart-*

*wright*, 195 P.2d 290; *State* v. *Stewart*, 210 Pac. 465; *Feinglass* v. *Reinecke*, 48 F.Supp. 438 (D.C. Ill.) ; *State ex rel. Ekern* v. *Dammann*, 254 N.W. 759. It is sought through the registration of new political parties as well as through the conventions of those already existing to nominate candidates for elective offices. That is the basis of representative democracy. The vote of an elector to nominate candidates by petition should be worth the same as the vote of an elector to nominate candidates by convention. The right to nominate candidates by convention is measured as a rule by the *votes* cast by each political party in the preceding elections. As long as that right to nominate candidates, either by convention of the parties or by petition for nomination, depends on the number of votes cast by the qualified voters in the preceding elections or on petitions signed and sworn by voters also qualified, the same cannot be unequal. A voter, for such purpose, is worth as much as another voter in the same conditions. To require, as maintained by the majority, that for the nomination of candidates by petition a number of petitions equivalent to ten percent of the total votes cast for Governor in the preceding elections, in *three-fourths* of the electoral precincts be required, while in order to retain the category of party and nominate candidates by convention *five percent* of such total, computed on the basis of the number of votes cast in the preceding elections in *one-half* of the precincts in which the ten percent was received, shall be sufficient to give to the vote of one elector half the value of the vote of another elector for the same purpose. *Cf. Gray* v. *Sanders*, 372 U.S. 368, 9 L.Ed.2d 821. I cannot conceive that the Constituent Convention—in view of the history of equality between the requirements for the registration of new parties and the requirements for the subsistence of the parties as such which transpires from the Report of the Committee on the Transitory Provisions and from its debates— ever thought of destroying its own work by denying to citi-

zens, in § 6 of Art. IX of the Constitution, the principle of equal protection of the laws which as a fundamental postulate of democracy on the other hand it sanctions in that document. The privilege that the total of five percent in one-half of the precincts represents, against the requirements of a total of ten percent in three-fourths of the precincts for the registration of a new party, would establish a hateful discrimination which could not prevail under the principles of equality of the electoral franchise.

It is my opinion that the transitory requirements provided by Act No. 6 of September 27, 1951 for the registration of new parties were "frozen" by the Constituent Convention through § 6 of Art. IX of the Constitution, and that C.A.P. would only need to file petitions for nomination of candidates in one-half of the electoral precincts totalling ten percent, computed in the manner provided in Act No. 6, in order to acquire the category of party by petition, since Act No. 140 of June 30, 1961 (Sess. Laws, p. 304) shall not take effect, insofar as it increases those requirements to ten percent and three-fourths, until after the general elections of 1964.

—O—

Mr. Justice Santana Becerra, with whom Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Blanco Lugo concur, dissenting.

San Juan, Puerto Rico, February 19, 1964

Act No. 5 of April 2, 1934 (Sess. Laws, p. 188) defined the term "party by petition" used in § 14 of the Election Law of 1919 (No. 79, Sess. Laws, p. 530) as that political party which registered candidates by petition in three-fourths or more of the electoral precincts throughout the Island and in ten percent or more of the total votes cast for the office of Resident Commissioner of Puerto Rico in the United States in the last preceding elections.

This same Act defined principal parties as those three political parties which received the greatest number of votes cast in the general candidates for Resident Commissioner in the last preceding elections. The principal parties and the parties by petition, after acquiring such category, would not forfeit the same until they failed to receive the votes necessary to retain it at some general elections.

By the amendment to § 14 by Act No. 137 of May 9, 1941 (Sess. Laws, p. 876) it was provided that the principal parties would be those whose candidates for Resident Commissioner received a number of votes equivalent to ten percent or more of the total votes cast by all the parties in the general candidates at the last preceding elections. The definition of parties by petition remained the same.

That was the statutory situation when § 14 was further amended by Act No. 48 of July 31, 1947 (Sp. Sess. Laws, p. 214). The amendment did not change the definition of principal parties contained in the Act of 1941 nor that of parties by petition, but it was provided in Act No. 48, by way of addition, that *to the effects and for the purpose of the election to be held in November 1948*, any party shall be considered a party by petition and shall have the same rights as any principal party which, in accordance with § 37 of the Election Law, registered candidates by petition in one-half or more of the electoral precincts throughout the Island and in five percent or more of the total votes cast in the 1944 elections for all candidates for the office of Resident Commissioner. The said five percent was to be computed by taking into consideration only the petitions of that party in those municipalities in which petitions signed by ten percent or more of the votes cast in each of those municipalities for the office of Resident Commissioner in the said elections of 1944 shall have been filed in the Office of the Executive Secretary.

If during the period between July 31, 1947, when Act No. 48 took effect, and the elections of 1948 it would have

been asked which was the law in force for the registration of a party by petition, the answer unquestionably had to be that it was the provision which required the registration in one-half of the precincts of five percent of the votes cast for Resident Commissioner, to be computed in the manner stated, rather than the requirement of registration in three-fourths and in ten percent, even though this part of § 14 was not repealed, and, on the contrary, had been reproduced in amendatory Act No. 48. If after the 1948 elections it would have been asked which was the law in force for those purposes, the answer unquestionably would have been that it was the requirement of three-fourths or ten percent of the votes. Indeed, after the elections the lightest requirements of Act No. 48 were *functus officio*.

The same situation was reproduced by Act No. 6 of September 27, 1951 (Sp. Sess. Laws, p. 106) for the forthcoming elections of 1952. Section 14 of the Election Law was amended leaving unchanged the traditional definition of principal party and of party by petition and, as it was done for the 1948 elections, it was again provided that *to the effect and for the purposes of the elections to be held in 1952*, any party shall be considered as a party by petition, again as was done for 1948, which registers in one-half or more of the electoral precincts five percent of the total votes cast in the 1948 elections for the office of Governor of Puerto Rico, such five percent to be computed in the same manner as under Act No. 48, namely, on the basis of those municipalities in which the party shall have filed a number of petitions equivalent to ten percent or more of the votes cast in each of such municipalities for the office of Governor in the 1948 elections.

If in the period between September 27, 1951, when Act No. 6 *supra* took effect, and the 1952 elections it would have been asked which was the law in force for the registration of a party by petition, the answer unquestionably would have been the compliance with the requirement of one-half of the

precincts and five percent of the votes for Governor, computed in the manner stated. After the 1952 elections these lesser requirements would have lost, as in 1948, all their legal effectiveness.

But now an event took place which did not occur in the electoral period of 1948. It happened that the Constituent Convention met and drafted the Constitution of the Commonwealth before the 1952 elections and the requirement of one-half of the precincts and five percent also became *functus officio* as a result of these elections. Section 6 of Art. IX of the Constitution provided the following:

"Political parties shall continue to enjoy all rights recognized by the election law, provided that on the effective date of this Constitution they fulfill the minimum requirements for the registration of new parties contained in said law. Five years after this Constitution shall have taken effect the Legislative Assembly may change these requirements, but any law increasing them shall not go into effect until after the general election next following its enactment."

The legal problem before us involves in one of its aspects the decision as to the number of petitions which the Christian Action Party shall file in order to be registered as a party by petition in the forthcoming elections of November. Section 14 of the Election Law has not been further amended as of the enactment of Act No. 6 of September 27, 1951. The problem which arises, which presents the difference of criteria between the litigants, is whether under the provisions of § 14 —Act No. 6 of 1951—the Christian Action Party is bound to file petitions in three-fourths of the precincts and in ten percent of the total votes cast for Governor in the immediately preceding general elections, in this case those of 1960, pursuant to the provisions of the third paragraph of § 14 *supra*; or, on the contrary, whether it should file petitions in one-half of the precincts and in five percent of the votes cast for Governor in the 1948 general elections, as provided in the

following fourth paragraph. We are dealing with a statute which contains a double set of requirements for the same purpose.

It is said that the requirements of one-half of the precincts and of five percent were transitorily adopted for the purpose of the 1952 elections. This is quite correct and those requirements would have disappeared completely from the electoral panorama after the 1952 elections were held but for the intervention of the Constituent Convention, a higher ranking instrumentality. Let us examine the effects of this intervention.

If we take upon ourselves the task of making a brief examination of the basic Election Law of 1919 throughout the subsequent amendments thereto, we shall see that all throughout the legislative history of the act there have been three sections of the statute closely relating to a common purpose: §§ 14, 36 and 37. Section 14 originally provided that principal parties were the two parties which shall have cast the highest and second highest number of votes for Commissioner to Washington at the last general elections. A political organization which shall have cast twenty percent of the votes for Commissioner to Washington would be considered an organized party until it failed to cast the said twenty percent. According to § 36, any party which shall have cast more than twenty percent for the office of Commissioner to Washington at a previous election was entitled to nominate candidates by convention for a subsequent election. Section 37 authorized the nomination of candidates by petition provided petitions were filed containing 200 signatures for municipal offices, 200 for a candidate for representative, 100 signatures in each of at least five municipalities of the senatorial district for candidate to senator, and 100 signatures in each of any 20 municipalities for Commissioner to Washington.[1]

---

[1] These numbers of signatures were changed by Act No. 15 of May 12, 1920 (Sp. Sess. Laws, p. 102).

The requirement of twenty percent for the subsistence as a party disappeared as of Act No. 3 of July 6, 1932 (Sp. Sess. Laws, p. 4), the same having been fixed at ten percent of the votes cast for Resident Commissioner. Under § 36, if such party had cast more than that ten percent, it could nominate candidates by convention as a result of its subsistence. The requirement on the specific number of signatures had already disappeared from § 37 by virtue of Act No. 2 of June 18, 1924 (Sp. Sess. Laws, p. 36), and it was provided that the petitions for candidates to be voted for in a precinct, municipality, district, or throughout the Island should be signed by petitioners equal in number to ten percent of the total votes cast for Commissioner to the United States in such precinct, municipality, district, or the Island, at the preceding elections, by at least 200 petitioners in each case. As of Act No. 5 of April 2, 1934 (Sess. Laws, p. 88) § 14 already defined the party by petition with the requirements of three-fourths of the precincts and ten percent of the votes cast for Resident Commissioner. Act No. 114 of May 15, 1936 (Sess. Laws, p. 588) deleted from § 37 the minimum of 200 signatures already mentioned. Sections 14, 36 and 37 of the Election Law have thereafter retained those characteristics.

This examination of the Act shows two things: (1) that traditionally the lawmaker always provided separately the requirements for the subsistence as a party after participating in a general election and the requirements for registration of a party to participate in a general election; and (2) that even though they are separate, and except at the beginning when a specific number of signatures (§ 37) and the twenty percent (§§ 14 and 36), were fixed these requirements have been related in the sense that in order to subsist as an old party as well as to organize a new party by petition ten percent of the votes cast for Commissioner to Washington, subsequently for Governor, was necessary, in an immediately preceding election. The concepts of subsistence and organi-

zation of a party were never interchanged nor merged by the lawmaker.

That legislative tradition was broken in the Constituent Convention. It will be observed that when § 6 *supra* of Art. IX of the Constitution was adopted, the Constituent Convention guaranteed to the parties that they shall continue to enjoy their rights during a specific period called a "freezing" period, not in terms of subsistence of the Election Law or in other terms, but in terms of fulfillment of the minimum requirements provided by law for the registration of new parties.

What was the result of all this? That even if that was done in connection with the enjoyment of the rights of subsistence of the parties after an election, the requirements for registration of new parties inevitably remained unchanged also during that period. Why? Because if the registration requirements did not remain unchanged during the same period, and if the Legislative Assembly modified them during that period, those being the requirements also provided to subsist with the rights of a party, the immobility provided by the Constitution would be dissolved indirectly by legislative action and would become academic.

To me this is a case of simple logic. If the Constitution sanctioned certain rights provided certain statutory requirements were met and provided that those rights could not be changed during a certain period, the determination of those rights produced the immobility of the requirements for a like term, in this case requirements for the registration of a party.

It is argued, as a simple solution to the problem, that § 6 does not deal with registration of new parties and that the Convention was not concerned with this, but to see that the political parties continued to enjoy their rights. However, the argument, as a way out of the problem, is defeated by what has been said hereinabove. We cannot disregard or

overlook the fact that, even if it was for the purpose of sanctioning for some time the enjoyment of certain rights of political continuity, the Convention used as denominator or basis the requirement for the registration of a new party. In order to accomplish the desired purpose, the Convention established a fact. For the sake of argument, the purpose for which the fact was established is not as important as the fact itself. The fact is that the requirements for the registration of a party by petition provided by law at the time the constitutional provision took effect were immobilized for a certain time—as an inescapable result of § 6 of the Constitution. Whether the action is one claiming rights of subsistence or of political continuity, or whether it involves, as in the case at bar, a problem of registration, in either case it would always be necessary to resort for its decision to the denominator common to both: to determine the requirement for registration of parties by petition.

Now then, which of those two sets of requirements of § 14 —Act No. 6 of 1951—for the registration of a party was immobilized by the Constituent Convention? Logically it had to be the so-called transitory lesser requirements, since otherwise they would have ceased to exist as soon as the elections of 1952 were held. We cannot overlook the fact that the delegates were deciding something which was to take effect during a period subsequent to those elections. That they referred to the lesser requirements which at that moment— they were debating the question on January 24, 1952 prior to the elections—governed for the registration of a party by petition, is evidenced by the trouble they took to spell out the phrase requirements—minimum—needed for the registration of new parties—provided-by-the-law-in-force when-this-Constitution-takes-effect.—Precisely, to distinguish them from the traditional requirements. If they had been referring to the so-called permanent requirements of three-fourths of the precincts and ten percent of the votes, which in such event

would not be the minimum, the specification would have been unnecessary altogether. The effectiveness of the latter was not limited.

If in a situation in which one side and another disagree on the meaning and scope of a constitutional or legislative provision the report of those who conceived and drafted the same is useful, and it seems to me that this is the classical situation of the value of a report or of a debate, this is what was said in part on § 6 in the report of the Committee on Transitory Provisions. After the gentlemen of the Committee advised that they did not propose to take away or limit permanently the power of the Legislative Assembly to prescribe reasonable rules for the organization of political parties: ". . . but we wish the subsistence of those which, having qualified to continue enjoying the political rights inherent in organized political parties,* cast for the office of Governor . . . a number of votes equivalent to five percent of the votes cast by all the parties for that office. *At present* this is the minimum requirement in order that the newly organized parties may register and operate as such." (Reference is made here to the five-year period.) "We are not creating a privilege. All existing parties, '*and even those which may be organized*' as long as the rule herein adopted is not changed, shall enjoy the *same* rights." The report establishes unquestionably (1) that the requirement of five percent was the one which the delegates considered as the law in force for the registration of a party, and (2) unquestionably that § 6 was not limited to the existing parties, but that it covered those *which may be organized thereafter* as long as the freezing period created by that section existed.

As soon as the proposal of § 6 was submitted to the Convention, and we already said that it read the *"organized"*

---

* The proposal read "the *organized* political parties." The enacted § 6 deleted the word *"organized."*

political parties, delegates Dr. Figueroa and Gutiérrez Franqui created the main issue of the debate. Thereupon Dr. Figueroa, with a subtle scruple for being a member of a minority party, moved for the elimination of the proposal arguing that it constituted a privilege and a generosity to the existing minority parties, setting forth considerations which he elaborated further upon explaining them to delegate Barrios.

Dr. Figueroa alleged that the generosity consisted in the fact, which he stated, that the existing organized parties would have the privilege of continuing as an organized party, at a time when the Election Law required ten percent for subsistence, if they received, he said, five percent *which is the percentage required at present for the registration of a party.*"

As soon as Dr. Figueroa made his proposal to eliminate § 6, because of that scruple, Gutiérrez Franqui asked him: "If the language were amended in order to make it clear that the intention is not to refer to the parties which are organized at present *but to those which may also be organized in the future*, would the colleague withdraw then his objection in that case?" To which Dr. Figueroa answered: "Yes, in that case, yes, because in that case it would not be a privilege nor compensation to any of the parties which have been here. Therefore, for that reason, yes, I would accept it."

Delegate Negrón López proposed an amendment to the second sentence of § 6, but made some contentions which delegate Solá Morales, Chairman of the Committee, in his turn interpreted in the sense that the position of Negrón López was that the whole matter should be deleted. In fact, for reasons somewhat remote from the problem under consideration, Negrón López was of the opinion that the matter should not be incorporated in the Constitution and on a certain occasion he said that he would agree to delete it. However, and notwithstanding the fact that Negrón López was

treading the paths of politico-constitutional law, in the course of his argument he said:

"Well, and of course, if admitting that such is the reality we adopt a security measure to preserve these instruments which have had so much influence in a historical stage of our existence as a people, we cannot curtail the quality of our action by *discriminating against other political parties*. Hence, the assertion made in the question which delegate Gutiérrez Franqui made to delegate Dr. Figueroa had to be *the only one* which could be made, because it is not possible at all for us to make a *discriminatory* Constitution."

The clear wish of Negrón López, which was also that of the Convention, was saved because the constitutional § 6 is not discriminatory in itself. However, at this time a majority of this Court by its interpretation makes § 6 discriminatory since, while one party may subsist as an instrument of political expression with all its rights and privileges by merely receiving in an election five percent of the votes for Governor, another party cannot subsist as such instrument of political expression with such rights and privileges unless it registers ten percent. Moreover, while the Convention strove hard to maintain the traditional equality of the Election Law, which was ten percent for subsistence and ten percent for registration, in order that it be five and five percent also, such effort of equality is destroyed at this time and it is said that it is five and ten percent. I fear also that such interpretation which makes § 6 discriminatory falls squarely within an unequal protection of the law.

Delegate Solá Morales heartily defended the amendment to § 6. A great part of his argument was aimed at refuting the criteria of Negrón López on other considerations. However, we find in Solá Morales' argument statements which touch the actual problem. At one moment he said: "It seems to me that the law has been amended on two occasions and that the requirement for the registration of political parties

has been limited." (It is clear that he was referring to the amendments for the 1948 and 1952 elections.) "At this very moment there is a law *in force* in Puerto Rico which limits to five percent the number of petitions needed by a party in order to comply with the legal requirements to be an organized party, and while we have done that for the *parties seeking registration* we maintain in the law ten percent for the parties which are registered and operating in the democratic struggle of the Puerto Rican people. Naturally, we contemplate that if a political party must only obtain five percent of the signatures in order to register, *following the norm of our own law*, it should also be recognized to the political parties which retain their personality as such if they receive also five percent of the votes. That is what would make us consistent with ourselves in the light of our *former* law: that it was ten and ten, now five and ten. . . . We establish here without limitation, without implying that it will limit the political parties which are *organized* at present, according to our understanding, but any other political party *which may be organized* would be covered by this constitutional provision." (Italics ours.)

The preceding arguments of Solá Morales confirm once again that it would be impossible to isolate the immobility of § 6 solely for the purposes of subsistence or survival of a party without such immobility inevitably entailing also the immobility of the registration requirements.

At the end of his argument Solá Morales said still more plainly: "There is no reason why we should embitter our life and complicate it with technicalities. It is a clear and simple thing. You, people, may *register* a political party with *five* percent of the voters who may give you their petitions. You, people, you may retain your political party if you cast *five* percent of the votes in the elections. That is all, since the law previously said that both things could be obtained on the basis of ten percent, today we limit it to five percent. . . .

In the meantime I believe that there exists *at present* an inexplicable situation of inequality, of imbalance, because political parties are required *five* percent for registration purposes while another political party is required *ten* percent to retain its personality. I believe they should be *on a par,* the way it used to be in the law." (Italics ours.)

That equality between the party to be registered and the party that was to subsist that was so eagerly searched and found in the Convention was frozen by § 6 until five years after the enactment of the Constitution by the additional prohibition that any law which changed the situation increasing the requirements for registration of a party would not go into effect until after the general election next following the approval of such change.

The debate in the Convention having been continued the following January 25, 1952, Committee Chairman Solá Morales forthwith asked Dr. Figueroa whether he was agreeable to delete from the proposal the word *"organized"* after "political parties" and Dr. Figueroa said he would. Section 6 of Art. IX was finally so voted.

In view of the text of § 6 and of the clear arguments on the issue herein of those who conceived and drafted § 6 and who knew what accomplishments they wished to obtain thereby, I cannot agree that after the general elections were held in 1952 that part of § 14 of the Election Law which reduced the registration requirements to one-half of the precincts and to five percent of the votes was rendered ineffective. The Constituent Convention, of higher ranking than the Legislature, took that provision by the hand and immobilized it with all its effectiveness at least for a period of five years after the Constitution went into effect, and that when the immobility ceased and a change was made such change would be effective as provided in said § 6.

Conceding that the entire legal situation admits any of the interpretations at variance, to my personal way of think-

ing I would not hesitate, in deciding the purely juridical question presented, to follow that interpretation which tends to facilitate and not to hinder or obstruct the electoral instrument to any group of political opinion.

Long ago Mr. Justice Wolf of this Court, under the regime of a territorial Organic Act, said:

"The Porto Rican law seems to make it impossible, or at least impracticable, for any voter to make an *independent choice* in the election. In other words, in Porto Rico the rule is that a voter must cast his ballot for candidates *already named* and submitted to the Board of Elections by the Executive Secretary . . . . Assuming this power in the Legislature of Porto Rico and finding that the only way in which all the qualified electors of Porto Rico may cast their vote as provided by the various sections of the Organic Act is by voting for one of the heretofore recognized or organized political parties or else by obtaining a right by petition, it would seem that any act which would make it hard for a considerable number of electors to cast their vote would be unconstitutional. Emphasis must be laid upon the fact that in Porto Rico, by the Organic Act, every qualified elector has a right to vote. *He cannot be compelled to vote for a party with which he does not affiliate.*" *Martínez Nadal et al.* v. *Saldaña*, 33 P.R.R. 687, 699–700. (Italics ours.)

Nothing short of this could be said at this time when we are governed by a Constitution which the Puerto Rican people itself adopted.

In *Dávila* v. *Sec. of State*, 83 P.R.R. 180 (1961), I had occasion to say in a case in which the question was whether or not some 264,000 newly registered voters could sign petitions to organize parties by petition (at 194):

"The enjoyment of the election franchise does not only constitute the right to cast the vote in the ballot box on election day for candidates and parties who appear in the tickets, but also the right of every citizen that the candidates of *their choice* be included in the electoral ballot. To deprive the newly registered voters of their right to submit petitions with candidates of *their choice* willing to establish government policies which

they wish, would amount to compelling the entire new electorate to vote for candidates and government platforms of parties already existing, unless they resort to the free column in the ballot, without having an opportunity to create any new party. Such a construction on our part would not meet the public policy of the Election Law underlying a good democracy." (Italics ours.)

Indeed, to vote on election day is but the final act of an entire political process for the obtainment of a representative and republican type of government such as that consecrated in our Constitution and which we all wish to exist. The pith of representation lies, not in the final act of voting, but rather in the initial guidance within the electoral instrument of every political expression which wishes to use that instrument and which is not yet an existing party. This takes greater significance when the voting system has been traditionally one for full candidates and when there are no separate general elections for different categories of elective offices.

The second aspect of the issue turns on the changes introduced by Act No. 140 of June 30, 1961 in § 37 of the Election Law as to the manner of registering a party. Appellants maintain that these changes are unreasonable and also that they are embodied in the immobility and restriction of § 6, and therefore that Act No. 140 should not be applicable to them in this election period.

Without advancing any opinion on those contentions, there is not sufficient basis in the record for their consideration. We should not pass on the constitutionality or unconstitutionality of the law in abstract form, and the record does not contain the factual elements necessary to determine whether the requirements prescribed by Act No. 140, if applicable, are so unreasonable in the light of the circumstances as to amount to an unconstitutional bar of the constitutional right of appellants to organize as a party.

For the reasons stated in this opinion, I dissent from the majority opinion.

—O—

Mr. Justice Blanco Lugo, with whom Mr. Justice Santana Becerra concurs, dissenting.

San Juan, Puerto Rico, February 19, 1964

This is a typical case of statutory construction in which reasonable men may differ. I would be guilty of intellectual arrogance if I asserted that the majority opinion is wanting of every reasonable basis, for I admit that the conclusion reached therein is noteworthy under the circumstances. However, my dissent refers to the scope to be attributed to § 6 of Art. IX of the Transitory Provisions of our Constitution.

It reads as follows:

"Section 6. Political parties shall continue to enjoy all rights recognized by the election law, provided that on the effective date of this Constitution they fulfill the minimum requirements for the registration of new parties contained in said law. Five years after this Constitution shall have taken effect the Legislative Assembly may change these requirements, but any law increasing them shall not go into effect until after the general election next following its enactment."

I accept the basic conclusion of the majority opinion to the effect that the minimum requirements for the registration of new parties provided by the law in force when the Constitution went into effect were embodied in § 14 of the Election Law, as amended by Act No. 6 of September 27, 1951 (Sp. Sess. Laws, p. 106), that is, those which in cryptical form we have called five percent and one-half of the electoral precincts. However, it is unquestionable that the constitutional provision is not confined to the question of subsistence as political parties. This is so because, if such theory were to prevail, the second sentence of the constitutional provision

which prohibits the Legislative Assembly to change "these requirements" until five years after the enactment of the Constitution, and in case it does so in order to increase them, the change could not take effect until after the general elections next following the enactment of the amendatory law, would be meaningless. It was not until the enactment of Act No. 140 of June 30, 1961 that "these requirements" were increased in order to require, among other things, ten percent and three-fourths of the precincts for registration purposes. Thus, we see how the freezing of the requirements, even for subsistence, had the effect—collateral if you prefer to call it that—of freezing also the requirements for the registration of new parties.

The report of the Committee on the Transitory Provisions and General Matters (4 Journal of Proceedings 2627) confirms our position. It reads thus:

*"The purpose of the preceding section is not to take away or limit, permanently, the power of the Legislative Assembly to prescribe reasonable rules for the organization of political parties.* Nor does it involve the expression of a policy aimed at permitting the proliferation of political parties, but we wish the subsistence of those which, having qualified to continue enjoying the political rights inherent in organized political parties, cast for the office of Governor, under their emblem, a number of votes equivalent to five percent of the votes cast by all the parties for that office. At present this is the minimum requirement in order that the newly organized parties may register and operate as such. The rule which we adopt is not unbending; after five years the Legislative Assembly may change those requirements reducing or increasing them; if they are increased, the law so doing may not take effect until after the next following elections. *We are not creating a privilege. All existing parties, and even those which may be organized as long as the rule herein adopted is not changed, shall enjoy the same rights."* (Italics ours.)

It is necessary to observe the significant references to the power of the Legislative Assembly to prescribe reasonable

rules for "the organization" of political parties—without exclusive reference to their subsistence—and that "all existing political parties, and even those which may be organized as long as the rule herein adopted is not changed by law," shall enjoy the same rights. I repeat that if the purpose of the rule were to guarantee exclusively the subsistence of the parties existing in 1951, any reference to the parties which may be subsequently organized would have been unnecessary.

I do not wish to elaborate further on this explanation, since it is probable that the Legislative Assembly, as has been publicly announced, will adopt different rules for the registration of new parties. Truly, it is up to that body, as the most authentic representation of the people, to deal with this problem and to determine its significance for the continued development of a democratic climate in our country.